## HUTCHINGS *vs.* COCHRANE.

### *In the matter of proving the Will of* EMMA J. COCHRANE.

WHERE a will, prepared by the counsel of the decedent, pursuant to her directions, was handed to her by one of the subscribing witnesses, who stated that he came "to witness her signing her will" and the testatrix, having read it, declared it to be her will, signed it, and both witnesses subscribed their names in her presence,—*Held,* that there was sufficient evidence of a *request* to the witnesses to attest the instrument.

A request to sign as witnesses may be communicated by signs, or may be implied from the acts of the parties.

When all the circumstances show the design of the testator to execute his will, his knowledge of the character of the instrument, and the purpose for which the witnesses attend, his signing the instrument, and acknowledging it to be his will, his observing the witnesses sign, and then taking the executed paper into his own possession without objection or comment, sufficiently establish and imply a request to the attesting witnesses to join in the necessary formalities.

A will, contested for alleged want of capacity, and for undue influence, admitted to probate.

WILLIAM INGLIS, *for Executor.*

The instrument propounded was executed and attested according to the statute.

1st. Both the attesting witnesses swear that she subscribed it in their presence, and that she acknowledged it, at that time, as her last will, and that they signed it as witnesses in her presence, and that of each other.

2d. The other requisite, that the attestation of the witnesses should be made *at the request of the testatrix,* was *substantially complied with.*

There is no particular form or manner in or by which it is requisite that the request of the testatrix should be made. The request may be verbal or by signs; it may

come from the witness to the testatrix, and will be sufficient if assented to by her.

In this case, Emma J. Cochrane knew the purpose for which the witnesses, William H. Sparks and George C. Barrett, were in attendance on her. Mr. Sparks states: "I asked her if it was her last will and testament: she said, Yes. I signed it. The other witness was George C. Barrett. He was present when she declared it her will. Both signed as witnesses in her presence, and at the table where she was sitting. I think I told her after she opened the envelope that I wanted her to swear to a paper, *and to witness her sign her will. I think I told her that it was necessary to have two witnesses.*"

The testatrix had previously to this, at the same interview, read the will, as both the witnesses testify, to which there is the usual attestation clause, a fact well known to the witness, George C. Barrett, who had copied it.

The circumstances amounted to a request, by the testatrix, for Sparks and Barrett to be witnesses. She was told the purpose for which they came, she read the formal attestation, she was told that two witnesses were necessary, she signed and published the instrument as her will, and they signed it as witnesses in her presence. Could a request be stronger, unless the Surrogate should be of opinion that a testatrix should convey her wish to the bystanders that they should attest, in the very phraseology of the statute, in *hæc verba*, and say, "I request you to be witnesses to the signing and publishing of this my last will and testament."

In the case of *Doe* vs. *Roe* (2 *Barbour's Supreme Court Rep.*, 201), circumstances similar, and not perhaps so strong, were considered sufficient evidence of a request by the testator that the witnesses should sign.

I would submit with confidence, to the consideration of the Surrogate, the proposition that if a testator subscribes a paper, and at the same time declares it to be

his last will and testament, to two bystanders, who thereupon in his presence subscribe their names as witnesses, a request to such persons to become witnesses, is to be implied from the circumstances *per se.* In this case the circumstances implying a request are much stronger than in the case last stated.

But even if the witnesses, Sparks and Barrett, had forgotten everything in relation to the accompanying circumstances, if they had not remembered that the testatrix signed the paper, and declared it to be her last will and testament, yet the fact of their subscription of the paper as witnesses to an attestation clause, as full as that in the present case, would have been sufficient to prove the proper execution and declaration of the instrument as a will, unless testimony appeared showing, affirmatively, that the statutory provisions had not been complied with.

This is the view taken by Chancellor Walworth, in the case of *Brinckerhoof* vs. *Remsen,* in 8 *Paige's Rep.,* 488. He observes, " *Where the subscribing witnesses to a will have subscribed their names at the end of an attestation clause, showing that all the formalities requisite to a valid execution of the will were complied with, the mere inability of the witnesses to recollect that the testator published the instrument as his will, is not sufficient to invalidate the same, unless the witnesses recollect that he did not declare it to be his will, and that the attestation clause was not read and understood, at the time of the execution of the instrument.*"

In the same case on appeal (26 *Wendell,* 325), Chief Justice Nelson observes, "No form of words will be necessary. The legislature only meant that there should be some communication to the witnesses, indicating that the testator intended to give effect to the paper as his will. Any communication of this idea, or to this effect, will meet the object of the statute. *I agree also that the mere want of recollection of the witnesses that the testator indicated*

*the instrument to be his will, after signing the attestation clause, ought not to be evidence* per se *of non-compliance with the statute. After that there should be something like affirmative proof of the want of publication."*

The Surrogate will remember that the controversies, in relation to the execution of wills under the statute of 1830, have arisen almost entirely in regard to the declaration required to be made to the witnesses that the paper subscribed or acknowledged is the testator's last will and testament.

The statute goes upon the idea that there should be no chance given to have a paper propounded, as a last will and testament, which the person executing it might have signed thinking it to be a paper of a different character. After subscription and a declaration by the testator to witnesses that the paper subscribed was his last will and testament, there could be no fraud or misconception in relation to the request to attest.

3d. At the time of the execution of the paper propounded, the testatrix, Emma J. Cochrane, was of sound disposing memory and understanding. It is unnecessary to allude particularly to the testimony of the Rev. Dr. Knox, of William C. Barrett, and Dr. Hosack, persons better qualified to judge on this point than any one produced on the part of the contestants, excepting the Rev. Mr. MacDonald, who allows that he had not conversation enough with her to judge. The weight of testimony is that her intellect was of an order rather superior to that of persons of her condition. *The witnesses impeaching it seem to have considered certain peculiarities of manner, such as taciturnity and a certain shyness, arising from bad health, as affecting the quality of her intellect.*

The Counsel for the contestants, however, gave up this

point of alleged imbecility, by express admission to the contrary.

4th. The testatrix was under no undue influence, either of Mrs. Thomson, the principal legatee, or any other person.

She was displeased with her brothers and sisters, for reasons well or ill founded. If those reasons were ill founded, it is unfortunate for the next of kin, but they were not of such a nature as to show any mental hallucination. She had formed her resolution to make a disposition of her property out of her own family, and she adhered to it notwithstanding all remonstrances, even from those who testify to her entire sanity, and who are supposed by the contestants to be adverse to them. The schedules Nos. 1 and 2, signed by her, show at once her determination and the clearness of her views.

As to the appointing a stranger, Mr. Hutchings, her executor, there is no argument in favor of the existence of undue influence to be deduced from that circumstance. He used to collect bills for medical attendance on her family, and she had probably heard of his character, and he was, besides, recommended by Dr. Hosack. It required as executor a man of business habits to manage her estate properly, through the difficulties that probably would beset it, judging from her former experience with her relatives, which office her friend Dr. Hosack would naturally decline, and for which the residuary legatee was but ill fitted.

As respects one of the contestants, Anna, whose peculiar situation would probably have most appealed to the feelings of the deceased, I would observe, that the instrument propounded gives to her what would probably be nearly equal to her distributive share of the property of the deceased, if there had been an intestacy, after the debts are paid.

For the reasons above stated it is submitted that the instrument propounded should be admitted to probate.

L. R. MARSH, *for Contestants.*

THE SURROGATE. The probate of this will is contested by the sister and brothers of the deceased, on the grounds of informal execution, weakness of capacity, and undue influence.

The will was prepared by Mr. Barrett, by the direction of the decedent, and, when engrossed, was transmitted to her for execution, by the hands of Mr. Sparks and Mr. Barrett's nephew, who attended at Miss Cochrane's residence for the purpose of becoming attesting witnesses. Mr. Sparks states that the instrument was enclosed in an envelope—was first handed her to read—she opened and read it. He then asked her if she understood the contents, and she replied in the affirmative. He requested her to sign it, and when she had done so, asked her " if that was her signature for the purpose ?" and if " that was her last will and testament ?" " She said, Yes ;" and the witness then signed his name, in the presence of Miss Cochrane, and at the table by which she was sitting. He further testified, that Miss Cochrane did not, to his recollection, ask him to become a witness, and he did not ask her whether he should. He says, however, " When I came there, I think I told her, after she had opened the envelope, that I came there to take an affidavit, and to witness her signing her will, or to take an acknowledgment that that was her will, or words to that import. I said nothing about George, why he came. I don't think George said anything to her, or she to him. After I stated what I came for, she first sat down, signed and swore to the affidavit, and then took up the will and read it ; and after that the will was executed, as I have stated before. I think I told her it was necessary

to have two witnesses. I don't know that she said any thing to that."

George C. Barrett, the other witness, a lad between 14 and 15 years of age, proves the signature of the testatrix; Mr. Sparks' inquiry if she acknowledged the instrument to be her last will and testament; her answer thereto, by nodding her head, or saying yes; and the subscription of the witnesses in her presence. He says, "I think that after she signed and Mr. Sparks signed, I put my name, without her asking me, or I asking her, as if it was taken for granted. * * * I don't remember that anything was said regarding the necessary number of witnesses." The will was engrossed by this witness, and the name of Mrs. Thomson having been left blank in consequence of uncertainty as to the mode of spelling it, he filled the blank at the time of execution, on ascertaining from Miss Cochrane how the name should be inserted. It appears from this proof, that there was full knowledge, on the part of the testatrix and the witnesses, as to the character of the transaction then performed. She read the instrument, had a blank filled in, signed it, replied in the affirmative to the question of Mr. Sparks, whether she acknowledged it to be her last will and testament, saw the witnesses attest it, and then took the paper into her own custody. Besides all this, Mr. Sparks thinks, when he first saw her and handed her the envelope, after she had opened it, he told her he had come to witness her will, or take the acknowledgment of her will. He thinks also that he told her it was necessary to have two witnesses. There is no proof that Miss Cochrane expressly requested the witnesses to attest the instrument, or that they expressly asked her whether they should become witnesses. The evidence is, in fact, the other way. There was no formal express request. But is it necessary the request required by the statute, should be made by word of mouth. Certainly not; the letter of the statute does not define the mode in which the request must

be made. It may be communicated by signs, or may be implied from the acts of the parties. When all the circumstances show the design of the testator to execute his will, his knowledge of the character of the instrument, and the purpose for which the witnesses attend, I am clearly of opinion that his signing the instrument, and acknowledging it to be his will, observing the witnesses sign, and then taking the executed paper into his own possession, without objection or comment, sufficiently establish and imply a request to the attesting witnesses to join in the necessary formalities. The request is contained in the present sanction then given to the act, by the conduct of the testator in signing and making the testamentary declaration, and in the recognition of the attestation, not only by acquiescence, but by taking custody of the paper after execution. Any other construction would be narrow, unreasonably literal and technical, and utterly repugnant to that good sense by which the conduct and actions of men should be judged and interpreted. I think, therefore, that the proof of execution in this case is sufficient.

As to the capacity of the decedent, it is not contended that she was wholly incompetent, and I do not deem it necessary to discuss the proofs bearing on that point. I feel bound, however, to express the opinion that she was abundantly competent to dispose of her property by will; and a large part of the evidence in the way of opinions unfavorable to the vigor and maturity of her intellect, may very naturally be attributed to her modest, retiring habit, simplicity of character, diffident and taciturn disposition—qualities likely to be fostered by chronic ailments, and the disease to which she ultimately fell a victim. We hardly look for great strength of intellect in a young, delicate and inexperienced girl. The law does not nicely measure grades of mental vigor, nor brand as incapable one who does not possess a certain degree of talent. The decedent's mind was sound. There was no derangement, aberration or delu-

sion. She had some education, could read, write, play on the piano; and, in the judgment of such men as her counsel Mr. Barrett, the Rev. Dr. Knox her pastor, and Dr. Hosack her physician, to whom she appears to have opened her mind freely, she was intelligent and perfectly rational.

In regard to undue influence, I find no evidence in the case pointing to such a conclusion; but it is urged that an inference of that kind is to be drawn from the tenor of the will, as compared with a previous will, and from other circumstances thought to be suspicious. It appears that the decedent came to the determination to leave her property, which was quite moderate in amount, to the lady with whom she had boarded. That she was brought to this result by the suggestion, persuasion or interference of any person whomsoever, is not only without a particle of proof, but is rather negatived by the evidence of Dr. Hosack and Mr. Barrett. She gave as reasons for her determination, the kindness of the intended beneficiary, and the unkindness of her relatives. It can serve no good purpose to inquire into the origin or extent of these family differences; for even if I should judge the feelings of the decedent on this point utterly unfounded, which, however, I am far from saying, it would be entirely unwarrantable to assert that her mind had been poisoned by designing and interested persons. To sustain that idea there is no evidence, and fraud is not to be presumed on mere surmise and conjectures. It is obvious from Mr. Barrett's statements, that the will was made, not only on due deliberation, but after the fullest consultation with her legal adviser, and very decided efforts on his part to persuade her to a different disposition. These efforts were resisted, the subject was canvassed, and she remained of the same mind. Testamentary capacity conceded, every one is the judge of his own acts in respect to his testament; and where the instrument appears to have been executed after ample consideration, and in accordance

with the expressed affections of the testator, it would be a very wanton exercise of power to attempt disturbing such a disposition, except upon clear evidence of fraud or imposition. I am perfectly satisfied that the will expresses the intentions of the decedent, and conforms to her real dispositions and affections ; that she was abundantly competent to dispose of her property ; and that the instrument propounded has been proved to have been duly executed as her last will and testament. It is admitted to probate accordingly.