**1.** WILLS—EXECUTION—SUBSTANTIAL COMPLIANCE WITH STATUTE.

In a probate proceeding it appeared that the will was subscribed by testatrix at the end in the presence of the witnesses; that testatrix, at the time of making the subscription, but before it was signed, declared it to be her last will and testament; that the witnesses signed after the will had been subscribed by the testatrix, in her presence, and at her request, though the request to the persons to sign as witnesses was made before the subscription of the will. *Held,* that there was a substantial compliance with 2 Rev. St. N. Y. p. 63, § 40, which provides that a will shall be invalid unless it is (1) signed by testator at the end; (2) subscribed, or the subscription acknowledged by testatrix, in the presence of at least two witnesses; (3) declared by testator to be his will at the time of the subscription, or the acknowledgment of the subscription, in the presence of each witness; and (4) signed by each of two witnesses at the end, in the presence of testator, and at his request.

**2.** SAME—EVIDENCE—GENUINENESS OF SIGNATURE.

On a contest as to the genuineness of the signature to an instrument propounded as a will, it appeared testatrix's name at the commencement of the will, in the attestation clause, and signature was written "Roxy Lany Williams." The contestants introduced papers executed about the time of the will to which testatrix signed her name "Roxalana Williams." They also showed that since the date of the instrument testatrix had denied making a will. Proponents introduced several deeds, dated during the early life of testatrix, in one of which her name was written "Roxy L. Williams," in another as "Roxy Lana," but signed "Roxalana," and one deed from her brother contains the name of "Roxy L." as grantee. It also appeared that old spoons, towels, and pillow-cases were marked "R. L. W." The draughtsman testified that he inserted the name as it appeared in his memorandum of instructions. Both of the subscribing witnesses, persons of intelligence, and whose reputations were unassailed, testified to having seen testatrix affix her signature to the will. Several expert witnesses testified on both sides, and photographs of the signatures were introduced. *Held,* that the evidence was sufficient to sustain the genuineness of the signature.

**3.** SAME—PROBATE—UNDUE INFLUENCE—CAPACITY.

In an action to set aside a will it appeared that the testatrix was about 82 years old. She was quite deaf, and in somewhat feeble health, but not confined to her bed. The memorandum of the will was prepared by the principal beneficiary, between whom and testatrix there existed the most friendly relations, amounting almost to those of mother and daughter, but between whom existed no ties of blood. The will was drawn by a third person, who handed it to the testatrix, and she took it into a separate room, returning in about half an hour, saying it was all right,—just as she wanted it,—and then executed it. No mention was made in the will of her blood relations, though it appeared she had frequently said she expected a portion of her property would go to them. Testatrix was a woman of general intelligence, and there was no proof of lack of memory, or of the exhibition of mental weakness or loss of will power. There was evidence that on an occasion after the death of her brother, from whom she inherited a large farm, testatrix, noting

that the will did not convey this farm to the principal beneficiary, procured a draft of a deed of the premises to such beneficiary, and, after pointing out an error in the name of the grantee, signed the deed. The will was executed more than a year and a half before her death. She was the administratrix of her deceased brother's estate, knowing the extent and value of the property. *Held,* that the will must be admitted to probate, since the contestants had failed to show that the action of the testatrix had been controlled by undue influence.

In the matter of proving the last will of Roxalana Williams, deceased. Application for probate by Norman Carpenter, executor and proponent. Julius Hall and Emory Hall, heirs at law, contestants. Decree admitting the will to probate.

*Warren, Patterson. & Gambell,* for proponent. *Smith & Parmenter* and *John Hall,* for contestants.

LANSING, S. The will of the above-named deceased was admitted to probate by my predecessor, Mr. LORD, some time in 1889, after a somewhat careful examination and cross-examination of the subscribing witnesses by the attorneys for the respective parties. Subsequently, and about February, 1890, by consent of the parties, the probate of the will was revoked, upon the stipulation that the testimony already taken should stand; and thereupon the contestants proceeded to offer testimony upon their part. The will before the present surrogate is contested upon four grounds: *First,* that the will was not executed with due statutory formalities; *second,* that the signature to the will was a forgery; *third,* that the execution of the will was procured by undue influence or fraud; *fourth,* that at the time of the execution of the will the decedent was not of sound mind and memory. The material facts in this case are as follows: Roxalana Williams, who was the widow of John B. Williams, died in the month of October, 1888, at the age of about 82 years. She was somewhat feeble in health for a year or two prior to her decease, but was not confined to her bed or room until a short time prior to her death. For a number of years prior and down to the time of her death, she had been quite deaf, and unable to hear any words spoken to her, but conversation was carried on with her by use of a slate or tablet of paper, aided by signs or gestures. Questions were usually written upon paper or slate, and verbal answers given by her. She was an intelligent woman, of an apparently active mind, and a large number of witnesses testify that she conversed readily and intelligently in the method above described. Ever since the death of her husband, which occurred 40 years or more prior to her death, she had resided with her brother, Jacob F. Hall, a bachelor, upon his farm of about 140 acres, situate in the town of Pittstown, which was of the value of about $5,000. Her brother was also possessed of personal property of the value of about $20,000. Mrs. Williams had a small property of her own, not to exceed $4,000 or $5,000, but no real estate. Jacob F. Hall died on the 28th of February, 1887, having been in feeble health for some months prior to his death. The disease was sotting of the brain. He died intestate, leaving his sister, Mrs. Williams, his sole heir at law and next to kin. On the 17th of February, 1887, the will in question here is alleged to have been made. It appears from the testimony offered by the proponent that about two weeks prior to the execution of the will, Merritt Snyder, who resided about two miles from the residence of Jacob F. Hall, where Mrs. Williams then lived, was requested by Mr. Carpenter, the husband of the principal beneficiary in this will, who lives upon the farm adjoining Mr. Snyder, to call upon Mrs. Williams, as she wanted him (Snyder) to do some writing for her. Mr. Snyder states that he went over and saw her; that they went into the room off from the kitchen, and that Mrs. Williams said she wanted him to do some writing for her,—to draw her will. He wrote on the slate that he would do it, if she would dictate to him just what she wanted. She wrote, in reply: "I don't know who I will get for witnesses." He wrote that "he could be one, and

his wife could be another." She said: "I didn't think you could witness it if you wrote the will." He nodded that he could. This is all that took place between them at that time. Two or three days afterwards Mrs. Carpenter brought over and gave to him a memorandum for Mrs. Williams' will. The instructions were drawn in Mrs. Carpenter's handwriting. Within a day or two Mr. Snyder made a draft of the will from the memorandum, interlined it somewhat, to make it correspond with the instructions, and then made a copy of the draft, which he subsequently compared with his wife, she holding the draft, and he holding the completed copy. The next morning Mr. Snyder and his wife went over to the house of Jacob F. Hall; got there about 9 o'clock. They found there, in the kitchen, Mrs. Williams, Mr. Hall, Mrs. Carpenter, Mr. Downey, and Hannah Eldredge. Shortly after his arrival Mr. Snyder handed Mrs. Williams the will. She left the room, and went to her own room, and, after the lapse of about 30 minutes, she came into the sitting-room, a room adjoining the kitchen, where she found Mr. Snyder and his wife sitting by a fire, which in the mean time had been built by Mrs. Carpenter. When Mrs. Williams came in Mrs. Carpenter left, and closed the door. On coming into the room, in the presence and hearing of Mr. Snyder and his wife, Mrs. Williams stated that it (referring to the will) was "all right; just as she wanted it." Then Mr. Snyder wrote upon the slate: "Do you acknowledge this to be your last will and testament, and do you want us to sign it,—my wife and I?" and she said: "Yes; but I must first sign it myself." Mrs. Williams then sat down. Snyder gave her a pen, and she wrote her name as it appears in the will, "Roxy Lany Williams." Thereupon Mr. Snyder and his wife wrote their names below as witnesses. The testatrix then said that "that was her will, and she was glad it was done." Snyder then folded up the paper, handed it to her, and she handed it back to him, saying she wished he would keep it for her. This will remained in the possession of Mr. Snyder until after the death of Mrs. Williams. Not long after the death of Jacob F. Hall, which occurred the 28th of February, 1887, Mrs. Williams removed to the house of Norman Carpenter, with whom she resided until her death. Harriet Carpenter, the wife of Norman Carpenter and principal beneficiary in the will, was the adopted daughter of Mrs. Smith Harrington, who was a sister of Mrs. Williams. Mrs. Harrington died some 25 years ago or more. It appears that there had existed, for years prior to the death of Mrs. Williams, a great degree of intimacy between Mrs. Williams and Mrs. Carpenter. Mrs. Carpenter was accustomed to visit Mrs. Williams quite frequently at her home, and to nurse and attend her in sickness, and Mrs. Williams gave frequent expression to others of her affectionate regard for Mrs. Carpenter. There was a large number of witnesses who testified upon this subject. While some of them were partial and interested, there were several others whose position and relation to the parties place them above suspicion of bias or prejudice. To one witness Mrs. Williams stated that "she thought a great deal of her, [Mrs. Carpenter,] and would do well by her, and that Mrs. Harrington, when she was going to die, said she had tried to be a mother to Hattie, and that she wanted her [Mrs. Williams] to take her place, and she had tried to do so. To another she said she thought more of Hattie than any one else living. To another, she "thought a great deal of her, and if she was her own daughter she didn't think she could think any more of her." To still another: "She was my sister's daughter. She does everything for me. I don't know what I would do without her." Ten years prior to her death she said, when sick, to her physician: "Hattie is my mainstay; she is always ready to come." There is no contradictory evidence upon this subject. These statements, and many others testified to by the witnesses, show that the relations between these persons, Mrs. Williams and Mrs. Carpenter, were very close and affectionate. They undoubtedly continued so down to the time of her death.

The nearest blood relatives of Jacob F. Hall and Mrs. Williams were three cousins residing in the state of Connecticut, who are the contestants herein. There had been some visiting and some correspondence between them, but, for the 30 years prior to the death of Jacob F. Hall and Mrs. Williams, the visits between them were very few, and the letters were quite infrequent, not to exceed one or two for a period of 10 years prior to the death of Mrs. Williams. After the death of Jacob F. Hall, and while Mrs. Williams was residing at Mr. Carpenter's, on the 28th day of August, 1888, Mrs. Williams executed a deed of the farm which she had inherited from her brother to Harriet Carpenter, for a consideration of $1 and affection. This deed was drawn by Jonathan Hoag, a justice of the peace residing some three of four miles from the residence of Mr. Carpenter, who was a stranger to her. He drew it at the suggestion of Mr. Snyder, who was himself informed by Mr. Carpenter that Mrs. Williams wanted a deed of the farm drawn. He prepared the deed, assisted by Mr. Snyder, and visited Mrs. Williams at Mr. Carpenter's. Upon examining it she called his attention to an error. He had written the name of the grantee as Harriet Harrington, instead of Harriet Carpenter. Thereupon he erased the name of Harrington and inserted Carpenter, and the deed was executed by her and acknowledged before him. The will of the deceased gives a legacy of $1,000 to Mrs. Carpenter, and $100 each to two other persons, and $50 each to two others, and the rest and residue to Harriet Carpenter. The principal part of the estate conveyed by the will is that derived by Mrs. Williams as heir at law and next of kin of her brother, Jacob F. Hall.

Considerable testimony was taken upon the trial in regard to the genuineness of the signature to the will. A large amount of expert testimony was produced upon each side, the contestants claiming that the signature to the will was not that of the deceased. The signature to the will (the Christian name) is written in two parts "Roxy Lany." It was usually written by Mrs. Williams in one word, "Roxalana," each syllable terminating in "a" instead of "y." It appeared, however, that she had upon one or more occasions signed her name "Roxa L. Williams," and her silver spoons and pillow-cases were marked "R. L. W." and "R. L. H." In her will she gives certain spoons marked "R. L. H." to one of the legatees.

The first question presented for decision in this case is, was the alleged will executed in compliance with the statute? The statute contains four requirements, the lack of either of which renders the execution of a will invalid: *First*, the instrument must be signed at the end by the testator; *second*, it must be subscribed, or the subscription acknowledged, by testator, in the presence of at least two witnesses; *third*, it must be declared to be his last will and testament by the testator at the time of the subscription, or acknowledgment of subscription, in the presence of each witness; *fourth*, it must be signed by each of two witnesses at the end, in the presence of the testator, and at his request. 2 Rev. St. p. 63, § 40. The following general rules have been adopted by the courts in the construction of this statute: *First*. The order, in which the formal acts of execution and publication should be done is not material, except that the testator must sign before the witnesses. *Jackson* v. *Jackson*, 39 N. Y. 153; *Rugg* v. *Rugg*, 21 Hun, 383. *Second*. The law does not require a technical and literal compliance with the statute; a substantial compliance with its requirements is sufficient. 1 Redf. Wills, (3d Ed.) *218, and cases cited. I think the evidence shows that there was at least a substantial compliance with the statute in the execution of this will. *First*. The will was subscribed by testatrix at the end, in the presence of the witnesses. *Second*. It was at the time of making the subscription, but before it was signed, declared by her to be her last will and testament. *Third*. The witnesses signed after the will had been subscribed by her, in her presence, and at her request, although the request to the persons to sign

as witnesses was made before the subscription of the will. It has been held that the request to sign as a witness need not be actual, but may be implied from circumstances; as " where persons are called to witness a paper, which they do, in the presence of the testator, he at the same time subscribing it, and declaring it to be his last will and testament." *Butler* v. *Benson,* 1 Barb. 526; *Hutchings* v. *Cochrane,* 2 Bradf. Sur. 295. It has been further held that the declaration may be made immediately before, as well as after, the subscription, if on the same occasion, and forming part of the same transaction. *Jackson* v. *Jackson, supra.* As this construction of the statute covers all of the alleged defects, it must therefore be held that the formalities necessary for the due execution of the instrument were complied with.

The next question, and one which was greatly contested upon the trial, is as to the genuineness of the decedent's signature to the instrument propounded as her will. The contestants, in support of their contention, produced a number of signatures of the alleged testatrix, made about the time of the alleged execution of the will; notably signatures attached to the papers which Mrs. Williams executed upon taking out letters of administration upon her brother's estate, signatures to the petition and bond, and also to the deed executed within a few months after the will. In each of these instances the Christian name "Roxalana" is signed in one word, whereas in the will it is signed "Roxy Lany," in two words, and is also differently spelled,—in the one case with two "y's," and in the other with none. And it is insisted that this mode of writing the name to the will affords evidence in itself that it was not written by the testatrix, because not in the usual spelling and form of her signature. It is further contended that, aside from the peculiarity in spelling, the signature, when critically examined, appears to be a simulated signature, and two expert witnesses, Prof. D. T. Ames and Dr. Hagan, were called, and testified to that effect; and photographs of the recent signatures of the deceased and that to the will were produced in contrast for examination. And, further, in support of their contention that the signature was never penned by the deceased, testimony was offered tending to show that, on several occasions after the date of the execution of the alleged will, both Mrs. Williams and Mrs. Carpenter denied that the will had been executed, or stated, in effect, that the deceased had made no will. Upon the part of the proponent several papers and documents were produced, dated many years before her death, in which Mrs. Williams' name was written "Roxa L. Williams;" one of which, dated March 28, 1859, and purporting to be a conveyance of real estate by her to her brother, is signed "Roxa L. Williams." Another instrument, purporting to be a deed, said to have been executed by Mrs. Williams and her husband, dated February, 1847, the body of which appears to be in the handwriting of her husband, has her name written as one of the parties thereto (the Christian name) "Roxa Lana," in two words, although the name is signed by her in one word, "Roxalana." In another instrument, dated March, 1859, her name appears as grantee, in a deed from her brother, Jacob F. Hall, and is written "Roxa L. Williams." It also appeared that old silver spoons and towels and pillow-cases kept at the residence of deceased, and used by her, were marked with the letters "R. L. W." and "R. L. H." It is very apparent that Mrs. Williams, at an early period of her life, at times at least, wrote and recognized her Christian name as spelled in two separate words. It further appears, from an examination of the will itself, that the name "Roxy Lany Williams," wherever it appears, which is at the commencement of the will, and also in the attestation clause, is written in two words, and spelled precisely as it is spelled in the alleged subscription to the will. Mr. Snyder testifies that he so inserted it in the will because he found it written so upon the memorandum which was delivered to him for drafting the will. I am satisfied that, so far as the first branch of the contention of the contestants is concerned, namely, that the signature must be

deemed a forgery, because spelled out of decedent's usual habit, cannot be sustained. It is quite conceivable that this old lady, who was executing a document (if she did execute it) of the solemnity of a will, after having read it over, as it is alleged, during the 30 minutes during which she had it in her possession, deemed it important that her name should be subscribed to the will as it was written. Indeed, it is quite natural, and the usual mode, for people, in subscribing formal instruments, to write their signatures in what they believe or understand to be its correct and original form, although not the form usually employed by them. And, finally, it is quite unreasonable to believe that a person desirous of simulating the signature of the decedent would have written it in a form and mode of spelling so unlike the one commonly used by her. The proponent also produced a large number of expert witnesses, including Dr. Ward, a professional expert. But the greater number of the witnesses called by the proponent were cashiers and tellers of different banks in this city, who were accustomed to examine hundreds of signatures each day, and upon whose knowledge and skill in that department the safety and credit of their several banks largely depend. These witnesses all testify that the signature to the will, notwithstanding its spelling and separation into two words, not found in the later signatures of Mrs. Williams' was unquestionably in her genuine handwriting. Upon the whole, I incline to the opinion, from a careful examination of the signature, in connection with the testimony and exhibits, that the signature to the will is genuine, and was written by Mrs. Williams. But beyond this, and entirely independent of this class of testimony, (expert,) is the testimony of the two subscribing witnesses to the will, both persons of intelligence, and whose reputation has been unassailed upon this hearing, and presumptively is unassailable, who both testify they saw Mrs. Williams affix her signature to the will; so that, upon the whole evidence, there cannot remain the slightest doubt upon the question of the genuineness of the signature to the will.

The remaining question, and the more serious one, is presented by the contestants' contention that this will was the result of undue influence or fraud, and not the free, spontaneous act of the testatrix. It is urged that Mrs. Williams was a person of great age, (82 years old,) somewhat feeble in health, shut off from ready communication with the world by reason of her lost hearing, residing with her aged brother, who was himself an invalid, and, by reason of his malady, (softening of the brain,) incapable of advising with her; that the memorandum for the will was prepared by Mrs. Carpenter, the principal beneficiary, without the presence or knowledge of any other person, so far as appears; that there existed between the deceased and the principal beneficiary, as she admits and claims, the most tender relations, amounting almost to those between mother and daughter, which had existed for years, and grown closer as time progressed; that said beneficiary was not a relative either by blood or affinity; that the blood relatives, heirs at law, and next of kin of said deceased were not even mentioned in her will, and although the deceased had frequently said she expected a portion of the property would go to them; and, finally, that Mrs. Williams denied, as is alleged, after the making of said instrument, on one or more occasions, that she had made a will; that Mrs. Carpenter had also, on several occasions, made the same denial. These circumstances, it is claimed by the contestants, establish that the alleged will, if executed, was the result of moral coercion amounting to fraud. Upon the other hand, the proponent relies upon the general intelligence and capacity of the deceased; the absence of proof of impairment of memory, or of the exhibition of mental weakness or loss of will power; her full knowledge of her property, and of those upon whom she desired to bestow her bounty; the deliberation and care with which the act was done; the affection which prompted the act, and the absence of all proof of fraud and imposition,—to repel any and all presumption of undue influence. Cases of this class have been before

the courts so frequently that certain general rules have been established by which evidence of the character adduced by contestants in this case should be weighed and applied. The courts have also decided what kind and amount of countervailing evidence will avail to repel the presumption of fraud or undue influence raised by such evidence. The general rule as to the capacity and ability of a person to dispose of his property is as follows: Any person of sound mind, acting with full knowledge of his affairs, competent to understand his relations to those whom he chooses to benefit, may bestow his bounty as he likes, although the disposition may appear, and in fact be, unjust and inequitable. *Clapp* v. *Fullerton*, 34 N. Y. 190; *Seguine* v. *Seguine*, 4 Abb. Dec. 191; *Coit* v. *Patchen*, 77 N. Y. 533; *Hollis* v. *Drew Theological Seminary*, 95 N. Y. 166. The fact that a will disinherits testator's kindred is not alone evidence of undue influence; nor is the fact that the memorandum for the will is prepared by the person who is largely benefited under the will, and who is active in procuring its execution. *In re Smith,* Id. 516; *In re Martin*, 98 N. Y. 193; *La Bau* v. *Vanderbilt*, 3 Redf. Sur. 384; *Cudney* v. *Cudney*, 68 N. Y. 148. Neither is the fact that a will is not in accordance with testator's previously expressed intention, although it may have an important bearing in connection with other facts; but, without such facts of a pertinent and forcible character, a change in purpose of making a testamentary disposition does not invalidate the will. *In re Phillips*, 98 N. Y. 267. "There can be no fatally undue influence unless there is a person incapable of protecting himself, as well as a wrong-doer to be resisted;" in other words, "it matters not how ingenious the fraud, or how coercive the influence, if there be intelligence enough to detect and strength enough to resist them." Schouler, Wills, p. 225; *Shailer* v. *Bumstead*, 99 Mass. 121. The proof of undue influence must be by direct affirmative evidence, or by such an array of circumstances as makes the inference of its exercise irresistible; in other words, the contestants must show facts utterly inconsistent with the hypothesis of the execution of the will by any other means than undue influence. *Gardiner* v. *Gardiner*, 34 N. Y. 155; *Loder* v. *Whelpley*, 111 N. Y. 239, 18 N. E. Rep. 874; *In re Clausmann*, 9 N. Y. St. Rep. 182; *Marx* v. *McGlynn*, 88 N. Y. 357. No presumption of testamentary incapacity arises from old age alone, (*Horn* v. *Pullman*, 72 N. Y. 269;) nor from deafness, (*Gombault* v. *Public Adm'r*, 4 Bradf. Sur. 226;) and even feeble and weak minded people may make valid wills, (*In re Gray's Will*, 5 N. Y. Supp. 464; *In re Gross*, 14 N. Y. St. Rep. 429.) In fine, the rule to be deduced from the authorities may be stated as follows: Undue influence must be an influence exercised by coercion, imposition, or fraud, and not such as arises from gratitude, affection, or esteem, and its exertion upon the very act must be proved. It will not be inferred from interest and opportunity; and if, on the other hand, there is adduced proof of capacity, mature deliberation, settled purpose, and absence of fraud and imposition, the will must be deemed the exercise of personal right, and be respected accordingly. Let us apply these rules here. The case for the contestants may be summarized as follows: *First.* The will was that of an aged, feeble, and deaf person. *Second.* It disinherited her heirs, although she had expressed an intention or desire that they should have some of her property, and gave the property to a stranger in blood. *Third.* The memorandum was prepared by the principal beneficiary, between whom and the deceased there had long existed the most friendly and even affectionate relations. *Fourth.* The alleged testatrix and beneficiary had each, as is alleged, stated upon occasions after the making of the will that no will had been made. I will consider these in the inverse order of their statement. As to the alleged admissions of the testatrix and the principal beneficiary under the will, it may be stated that it is a well-settled rule that admissions of the alleged testatrix, not made at or about the time of execution of will, are not admissible, and cannot be received as a statement of facts upon the question of undue in-

fluence and fraud, although such admissions may be competent on the question of mental capacity, in connection with the charge of undue influence. *Marx* v. *McGlynn*, 4 Redf. Sur. 455, 88 N. Y. 357; *Waterman* v. *Whitney*, 11 N. Y. 166; Abb. Tr. Ev. 115.   It may be further stated that the alleged admission of Mrs. Carpenter that no will had been made to her knowledge is not, I am satisfied, she not being the sole beneficiary under the will, competent evidence upon any issue.   So far, therefore, as these latter alleged admissions are concerned, they may be regarded under the authorities as immaterial in the decision of this case.

The charge that the memorandum was drawn, and the making of the will was procured, by the principal beneficiary, with whom the relations of the deceased were most intimate, presents the most serious question in the case, and the courts say, under such circumstances, it devolves upon the beneficiary to show that it was the free act of the mind of the testatrix.   The proponent insists that this is conclusively shown in this case by the manner in which the will was prepared and executed.   The alleged testatrix had indisputably the instrument in her possession, which was plainly written, for a half hour, and, after such opportunity to inform herself of its contents, she came in the presence of two persons who were in no wise related to her or Mrs. Carpenter, and stated that the will was all right, and just as she wanted it, and thereupon executed it, and declared it to be her last will and testament.   It must be conceded that, if deceased was of substantially unimpaired mind and memory, with such ample opportunity for knowledge and deliberation upon the contents of the alleged will, even if she had no prior knowledge, as was afforded in this case, the charge of implied fraud and imposition would not be sustained.   As a further proof of decedent's intent to convey the bulk of her property to Mrs. Carpenter, the proponent points to the fact that, although the will gave the residue of the property to Mrs. Carpenter, yet, after the death of her brother, J. F. Hall, by which she became entitled to a large amount of personal property, in addition to a farm of 140 acres, her attention was called to the question that the will, perhaps, did not carry the farm; that she then, in the presence of a stranger, after careful examination of the instrument, and pointing out an error in the name of the grantee, signed the deed of the farm; thus deliberately turning over the entire balance of her estate to the principal beneficiary in the will, thereby showing, as is alleged, that she must have understood and intended that Mrs. Carpenter should have her entire estate, with the exception of the small legacies given in the will. Upon the whole, it seems to me upon this point that the requirement of the law has been met, and that there has been shown knowledge, capacity, deliberation, and settled purpose in the disposal of the property, with an entire absence of any proof of fraud or imposition producing the result.   "The fact that the beneficiary communicated to the draughtsman a provision in her favor to be inserted in the will will not be sufficient to shift the burden, where the testatrix was intelligent and had personal knowledge of the contents of the will.   *In re Martin*, 98 N. Y. 193.

Upon the question of the disinheritance of heirs, the same considerations above stated have equal application, to which must be added the additional consideration that the next of kin were cousins only, and lived in another state, and that there had been no intercourse between the families for years, except a visit and letters at very considerable intervals; while, on the other hand, Mrs. Carpenter was regarded by testatrix as a daughter, and the most ardent expressions of confidence and love were indulged in by Mrs. Williams respecting Mrs. Carpenter, which were fully reciprocated on the part of Mrs. Carpenter, not so much by expressions as by care, attention, and kindness towards the deceased, which continued down to the last moment of her life. It has been repeatedly held that an intelligent and deliberate testamentary disposition of property to strangers in blood, when prompted solely by grati-

tude, love, and affection, will not be set aside in favor of any presumed or even previously expressed intent of a testator not to disinherit his heirs. The same general considerations will apply upon the question of decedent's age and infirmities; to which should be added the additional facts that the will was executed more than a year and a half before her death; that she was the administratrix of her brother's estate, and consequently knew the value and extent of his property, which constituted the bulk of her estate; and, finally, was not without independent advisers as to the disposition of her property. If, therefore, she was of sound mind and memory, of which there is abundant evidence and substantially no countervailing proof, was able to know and retain in her mind the value and extent of her property and those who were or might be the proper objects of her bounty, and to choose intelligently between them, and, uninfluenced by fraud, did so choose, then, whatever her age or infirmities, or however completely she excluded her blood relatives from participation in her bounty, or however intimate her relations may have been with the principal beneficiary, or however great may have been the influence of the beneficiary, as the result of kind offices and considerate treatment of deceased, the will must stand.

In conclusion, the evidence discloses a complete knowledge on the part of the testatrix of the contents of the will, ample deliberation, settled purpose, and a full legal capacity; and I fail to find from the evidence that the principal beneficiary, or any one in her interest, so controlled the action of the testatrix, either by importunity which she could not resist, or by deception, fraud, or other improper means, that she thereby procured the execution of this inst..ment. The burden of establishing this was upon the contestants, and, they having failed in this, the will must be admitted to probate. Let a decree be so prepared.