---

(17 Misc. Rep. 547.)

## In re WOOLSEY'S WILL.

(Surrogate's Court, Ulster County.   July, 1896.)

1. WILLS—PUBLICATION.
    Publication of a will is shown by evidence that one of the witnesses was the lawyer who drew the will at testator's request, and took it to his house to be executed, and that testator requested the other witness to read the attestation clause.
2. SAME—EXECUTION—REQUESTING WITNESSES TO SIGN.
    A request to sign a will as a witness is established where the witness drew the will at testator's request, and took it to his house to be executed, and the attestation clause recited that the request was made by testator.
3. SAME—TESTAMENTARY CAPACITY—INTOXICATION.
    Intoxication of testator at the time the will was executed is not established by testimony that the witness took him three bottles of whisky three or four hours before the will was executed, and that he was drunk

on that day, but the witness did not see him after he delivered the whisky; other witnesses, who were with testator when the will was executed, testifying that he was then sober.

Proceeding for probate of the will of George C. Woolsey, deceased. Granted.

C. Meech Woolsey (Eldoras Dayton, of counsel), for proponent.
Brinnier & Newcomb and John F. Cloonan, for Anna C. Woolsey, a niece.
A. D. Lent, for William H. Woolsey, a nephew of deceased.

BETTS, S. George C. Woolsey died in this city on the 15th day of April, 1896, having, on April 11th, executed a paper writing which is offered here for probate as his last will and testament, by which he left all his property to his brother, C. Meech Woolsey, and made him the executor thereof. Objections were filed by a niece and nephew thereto, and a great deal of evidence has been taken. The evidence for the contestants has been directed towards three points: First, that the will was not properly executed in accordance with the statute; second, that the testator was drunk at the time of its execution; third, that he was incompetent to make a will, by reason of the effects upon him of drink, illness, and of his general incompetency. I will briefly consider these points, and the conclusion that I have come to in regard to them.

As to the first point, it is claimed that the testator did not declare the instrument in question to be his last will and testament, and did not request the witnesses to subscribe their names thereto as such. The evidence is that on the day on which this paper was executed the deceased gave to Edwin D. Brandow, a lawyer of this city, a brief memorandum, and requested him to draw his will therefrom, and to "see to it to-day." This was about 2 o'clock in the afternoon. Brandow took the paper to his office, drew the will upon a form, and returned to Woolsey's house at about 7 or 8 o'clock in the evening. On his way there, Brandow met Francis H. Griffith, a neighbor of Mr. Woolsey, and the two went in together. Mr. Brandow gave Woolsey the paper, which he read. Woolsey then signed the paper in the presence of both of the witnesses, and handed it to Griffith, with a request, as Griffith says, that he read the attestation clause, and sign it or verify it. The attestation clause is very full, and is as follows:

"We, whose names are hereto subscribed, do certify that George C. Woolsey, the testator, subscribed his name to this instrument in our presence, and in the presence of each of us, and at the same time he declared in our presence and hearing that the same was his last will and testament, and requested us, and each of us, to sign our names thereto as witnesses to the execution thereof, and which we hereby do in the presence of the testator and of each other, the day of the date of the said will, and have written opposite our names our respective places of residence."

Brandow testified that Woolsey said to Mr. Griffith, "Witness my will," or "This is my will." This is, in substance, the entire testimony as to the declaration of deceased.

It is evident that Brandow knew that this was a will, because he had drawn it, and gone there for the express purpose of having it executed. It is also evident that Griffith knew it was a will, because he, at the request of the deceased, read the attestation clause. The statute is:

"Such subscription shall be made by the testator, in the presence of each of the attesting witnesses, or shall be acknowledged by him, to have been so made, to each of the attesting witnesses. The testator, at the time of making such subscription, or at the time of acknowledging the same, shall declare the instrument so subscribed, to be his last will and testament."

It is held (Gilbert v. Knox, 52 N. Y. 125) that:

"The object of this provision is to secure the testator against fraud and imposition, and the knowledge that the instrument which the witnesses are called upon to attest is a will must be communicated to them by the testator at the time of his subscription or acknowledgment; and knowledge derived from any other source, or at any other time, of the same fact, cannot stand as a substitute for the declaration of the testator. But the fact that the testator was fully apprised of the testamentary character of the instrument may be considered in aid of proof tending to establish a publication."

It is held in Lane v. Lane, 95 N. Y. 494, that no particular form of words is required or necessary to effect a publication; and in Re Hunt, 110 N. Y. 278, 18 N. E. 106, that a substantial compliance with the requirements of the statute as to execution and attestation is sufficient. From the testimony in this case, and under the above decisions, I hold the testator to have sufficiently declared this to be his last will and testament.

As to the request for the witnesses to sign by the testator, the statute is as follows: "There shall be at least two attesting witnesses who shall sign their names as witnesses at the end of the will at the request of the testator." Griffith was requested to sign, and requested to read the attestation clause. Brandow did not testify that the deceased requested him to subscribe as a witness, nor was he asked the question. Brandow signed the attestation clause, which recites that the request by Woolsey was made. In Hutchings v. Cochrane, 2 Bradf. Sur. 295, it was held that a request to sign as witnesses may be implied from the acts of the parties. In that case one of the subscribing witnesses handed the deceased the will, stating that he came "to witness her sign her will," and the testatrix, having read it, declared it to be her will, signed it, and both witnesses subscribed their names in her presence. No direct request was proved. In Coffin v. Coffin, 23 N. Y. 9, a request was made to only one of the witnesses to sign as a witness, and it was held to be a good attestation, the court holding:

"Now, the statute, it is true, declares each witness must sign on such request; but the manner and form in which the request must be made, and the evidence by which it must be proved, is not prescribed. We apprehend it is clear no precise form of words, addressed to each of the witnesses at the very time of the attestation, is required. Any communication importing such request, addressed to one of the witnesses in the presence of the other, and which, by a just consideration of all the circumstances, is intended for both, is, we think, sufficient."

In Peck v. Cary, 27 N. Y. 9, it is held that the object of the statute is that an officious signing by the witnesses, without any

privity with the testator, should not be recognized as sufficient. In Re Nelson's Will, 141 N. Y. 152, 36 N. E. 3, the proof was substantially as follows: The will had been drawn and witnessed by a partner of the deceased, and this partner had predeceased Nelson. The remaining subscribing witness, the coachman of Nelson, denied that he had ever been requested to sign by Nelson as a witness, or that Nelson had acquiesced in the request by Baker, the other subscribing witness, that he should sign. The will was, however, admitted to probate. It was held that, both Nelson and his partner, Baker, being lawyers, well knowing what was needed for the due execution of the will, it was not a reasonable supposition that they neglected any essential requirement. In that case the attestation clause did not contain the usual paragraph that the witnesses signed at the request of the testator. In Re Cottrell's Will, 95 N. Y. 339, it is held that the attestation clause is always some proof of the due execution of the will. In this case we have the request from Woolsey to Griffith, in the presence of Brandow, Brandow being there at the request of Woolsey to have the will executed. Woolsey was a lawyer by profession. I hold that, in the spirit and meaning of the decisions cited, and of the statute, there was a sufficient request to Brandow for him to sign as a witness.

As to the second point: Without going into the testimony in detail, the evidence is convincing that the testator was not drunk at the time the will was executed. Both subscribing witnesses say that he was competent to make a will. Henry A. Wolfer, his nephew, and Miss Flannigan, the housekeeper, both testify that he was sober on Saturday. Hesse only says that he was drunk on Saturday. He did not see him within apparently three or four hours from the time the will was executed. Hesse says that he took the deceased three bottles of whisky on the day the will was executed, the last being about 3 or 4 o'clock. The testimony is that the will was executed between 7 and 8 o'clock, or perhaps a little later. In order to show such drunkenness, or such condition from drinking intoxicating liquors, as would avoid the will, the contestants must show that the deceased was intoxicated, or that his understanding was clouded or reason dethroned by actual intoxication, at the exact time the will was executed. Peck v. Cary, supra; In re Halbert's Will, 15 Misc. Rep. 308, 37 N. Y. Supp. 757; Van Wyck v. Brasher, 81 N. Y. 260.

Now as to the general question of incompetency of deceased: The contestants' witnesses testified to many acts of the deceased that they considered irrational. Among the most conspicuous are allowing some or all of his real estate to become incumbered by taxes, and one piece at least to be actually sold. These witnesses also testified that they knew nothing as to the amount of money the deceased had, or whether he was able to meet those taxes or not, but largely predicated their assertions on the assumption that he had the means. The uncontradicted testimony is that he owned a great deal of real estate, all or the most of it being heavily incum-

bered by mortgages and taxes. He also had frequent disputes with city officials as to special assessments, and for the actual or alleged violations by himself of city ordinances. On one or more occasions he was arrested for not keeping the snow properly cleared from the sidewalk in front of some of his real estate. He did not seem to be entirely pleased with this, and expressed his disapprobation of the officers, the ordinances, and the entire situation, with much more vehemence than discrimination. It will hardly do for this court to hold that a man who loses his temper on similar occasions to some of those testified to here is per se irrational. If that were done, few citizens, I think, would care to leave the disposition of their property to the justice or discernment of the surrogate's court. Many instances of peculiar actions, doings, and sayings of deceased were testified to. A man of nearly 70 years of age, he had for many years been without any regular occupation save caring for his large real-estate interests. He owned the Mansion House (or an interest therein), numerous tenement houses, and the greater portion of what has been long known as "Woolsey's Commons," in this city, a farm near Rosendale, and wild lands in the Catskills, and other real estate. This real estate and the business connected therewith brought him in contact with a great many people. Accustomed to spending much of his time at the Mansion House, and on account of his varied interests, he had a very extensive acquaintance. He was at times of an irascible disposition, which was increased in the latter part of his life by excessive drinking, and there is no doubt that at the time the will was executed he was in a very feeble condition. He, however, continued to do his own business until the Tuesday, as he died Wednesday morning. He literally died in the harness. He closed a real-estate deal on that Tuesday that had been running for several months. He also, about the time the will was executed, and during his last sickness, gave some of his friends and relatives small mementoes, and was endeavoring to and did close up several matters of business, showing that he realized that his end was near. His wife was dead, and he lived with a nephew and his housekeeper. He thought a great deal of his real estate, and went to the commons early and late, and traveled and retraveled over it. About as pathetic a scene as ever related in this court, which abounds in them, was his being taken by his nephew, the day after the will was executed, the whole length of the commons. It was on the last Sunday of his life, when he apparently knew that death was very near. Unable to spend more than a half hour out of doors, his last visit was not to relative or cherished friend, but to the commons, concerning which the testimony shows that he had made so many and varied plans that some of the witnesses thought him irrational because he sold a building lot where he had at one time proposed to make a street. The only testimony as to his mental condition that is at all serious is that of a physician, Robinson. Robinson was first called Sunday, the 5th instant, and did not visit him again until Saturday, the 11th, the day the will was executed. Robinson could not have

considered Woolsey's condition very serious, or he would not have let six days intervene between his professional calls. · He testified to his interviews with deceased on the evening of Saturday, the 11th, went over all the conversation he said he could recollect, and found nothing in it that was irrational. His conclusion as to that conversation corresponds with my own. But in another portion of his evidence he says that deceased did not have a lucid interval from the 5th of April until his death, the 15th. His testimony is not consistent with itself. He also admits, and Wolfer corroborates him, that certain statements made to Wolfer and the proponent were not consistent with his evidence on the trial,—in fact, flatly contradict it. He was paid $5 by Woolsey on the day of his first call, and he considered that irrational, although Woolsey owed him for two other visits about a year ago. The testimony of the other physicians, being predicated on hypothetical questions, which questions were based on the testimony offered by contestants and on the testimony of Dr. Robinson, I do not consider as throwing much light on the actual condition of deceased at the time the paper offered here was executed. Several witnesses, however, were sworn who had had actual business transactions with the deceased just before, about the time, and just after the making of the will. They not only declare the acts and transactions they detail as rational, but give the transactions themselves, which show the deceased to have been capable of protecting his own interests. I have read over very carefully the entire evidence, and I gave it close attention while it was being taken. A further discussion would serve no good purpose. It is voluminous,—over 400 pages of typewritten matter. From a conscientious review of it, I can come to no other conclusion than that George C. Woolsey was of sufficient understanding to comprehend the amount and extent of his property, and who were, or might be, the objects of his bounty, and to whom he desired to leave his property, and that he effectuated his testamentary intentions. Van Guysling v. Van Kuren, 35 N. Y. 70; Peck v. Cary, supra; In re Peck's Will (Sup.) 17 N. Y. Supp. 248; In re Clearwater's Will (Surr.) 2 N. Y. Supp. 99.

A decree admitting his will to probate may be handed up in accordance with this memorandum. Decreed accordingly.